

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 21, 2026

**BY ECF**

The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

     Re: *United States v. Ana Gabriela Rubio Zea*, 23 Cr. 180 (KPF)

Dear Judge Failla:

     The Government respectfully submits this letter in advance of the January 27, 2026 sentencing of defendant Ana Gabriela Rubio Zea, following her guilty plea to conspiring to import fentanyl into the United States, in violation of Title 21, United States Code, Sections 952(a), 959(a), 959(c), 960(a)(1), 960(a)(3), 960(b)(1)(F), and 963.

     As described below, Rubio Zea was a large-scale broker and distributor of the chemicals used to manufacture fentanyl, known as fentanyl precursors. In this capacity, Rubio Zea connected Chinese chemical precursor companies with individuals who manufactured fentanyl for the Sinaloa Cartel in Mexico, using a Guatemala-based front company to conceal and promote her purchases of precursor chemicals used to manufacture that fentanyl. Indeed, as described further below, throughout 2022, Rubio Zea had numerous communications with an undercover agent ("UC-1") for the U.S. Drug Enforcement Administration ("DEA") in which she, among other things, (i) described her role as a broker for fentanyl precursor chemicals and her connections to individuals associated with the Sinaloa Cartel and Chinese chemical companies; (ii) arranged for the purchase and delivery of fentanyl precursor chemicals; and (iii) attempted to negotiate the sale of approximately 1,000 "M30 pills"—counterfeit prescription pills that typically contain fentanyl—to UC-1, including by sending UC-1 a photograph of the pills. In sum, Rubio Zea was a sophisticated, well-connected broker who played an integral role in the procurement of chemical precursors used by the Sinaloa Cartel to manufacture deadly fentanyl.

     Notwithstanding the seriousness of Rubio Zea's conduct, the Government recognizes that her case presents certain specific mitigating factors relevant to determining the appropriate sentence. For example, the Government acknowledges that, unlike many of Rubio Zea's charged co-defendants, and as described further below, Rubio Zea's conduct did not involve the use of firearms or violence or rely upon high-level public corruption. Nor did Rubio Zea exercise a leadership role within the charged conspiracy.



Accordingly, and for the reasons set forth below, the Government respectfully submits that a substantial term of imprisonment, albeit one that is below the 108 to 135 month-range calculated and stipulated to by the parties under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines"), would be sufficient but not greater than necessary to achieve the purposes of sentencing.

## I.  Offense Conduct

The Sinaloa Cartel is a primary distributor of fentanyl to the United States and relies upon, among others, brokers who can facilitate the acquisition of precursors chemicals used to manufacture fentanyl.[2] Rubio Zea was a Guatemala-based intermediary who connected Chinese chemical companies that manufactured fentanyl precursor with individuals who manufactured fentanyl for the Sinaloa Cartel, with the knowledge that the chemicals would be used to produce and distribute fentanyl. *See* November 28, 2025 Final Presentence Investigation Report ("PSR") ¶ 28.

Rubio Zea has been involved in brokering the sale of large amounts of fentanyl precursor chemicals since at least in or around 2021, and she regularly conducted extensive negotiations about the purchase of those chemicals from China-based companies for resale to Mexican clients. For example, on September 15, 2021, law enforcement officials in Guadalajara, Mexico seized a shipment of approximately 25 kilograms of fentanyl precursor that Rubio Zea had ordered from a company in China and which Rubio Zea intended to deliver to a fentanyl trafficker in Culiacán, the capital of the Mexican state of Sinaloa. PSR ¶ 29.  Photographs of the seized fentanyl precursor chemicals that Rubio Zea sent to Mexico are below:

---

[2] *See* U.S. Drug Enforcement Administration, National Drug Threat Assessment 2024 at 6, https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf ("The Sinaloa Cartel dominates the fentanyl market through its manipulation of the global supply chain and the proliferation of clandestine fentanyl labs in Mexico , . . . Los Chapitos initially established a base of operations for manufacturing illicit fentanyl in the mountains near Culiacan. Now, they control the procurement of precursor chemicals, largely from China, and direct the production of illicit fentanyl from labs hidden in the mountains of Sinaloa and in other Sinaloa Cartel strongholds throughout Mexico.").







As reflected in stored messages on Rubio Zea's iCloud account, just two weeks after the seizure, a co-conspirator in China ("CC-1") sent Rubio Zea a price quote for the shipment and messages about disguising a particular shipment of fentanyl precursor chemicals as a different chemical called "CARBOMER 940" to "avoid[] trouble." PSR ¶ 31. Rubio Zea responded that the "name change actually seems wonderful [prayer emojis] . . . I was going to require that but since you offered seems great." PSR ¶ 31. Rubio Zea was also fully aware that the chemicals she was brokering were being used to manufacture fentanyl; indeed, in November 2021, CC-1 told Rubio Zea that he was no longer permitted to sell a particular precursor because of conflicts between the United States and China about "fentanyl intermediaries." *See* PSR ¶ 32.

Rubio Zea's participation in brokering the sale of fentanyl precursor chemicals to Mexico, and to individuals that she knew and believed to be associated with the Sinaloa Cartel, continued

throughout 2022, as evidenced by her participation in recorded communications and meetings with UC-1. Over the course of those recorded communications and meetings, Rubio Zea explained that she controlled and used a Guatemala-based import-export company named IGIGI Technologies to conceal and promote her purchases of fentanyl precursor chemicals for individuals associated with the Sinaloa Cartel, and that she had created the company to create the appearance of legitimate export-import activities in Guatemala. PSR ¶ 43. These claims are corroborated by data stored on Rubio Zea's iCloud account, which shows, for example, that Rubio Zea received an invoice in September 2021 from a Chinese chemical company for the 25-kilogram fentanyl precursor described above. PSR ¶ 43. The invoice showed that IGIGI Technologies was the Miami-based buyer of the fentanyl precursor chemicals and directed IGIGI Technologies and Rubio Zea to pay approximately $17,375.79 U.S. dollars ("USD") to a U.S. bank account. PSR ¶ 44.

In April and September 2022, Rubio Zea met with UC-1 in Guatemala City to discuss fentanyl precursor shipments for the Cartel. PSR ¶¶ 33-39. The meetings were audio-recorded and surveilled by law enforcement and revealed that Rubio Zea had multiple sources in China for fentanyl precursor and Sinaloa-based customers whom she knew to be producing fentanyl.

First, at the April 2022 meeting, Rubio Zea discussed some of her prior efforts to broker and deliver fentanyl precursor chemicals. Specifically, Rubio Zea described a prior shipment of one kilogram of fentanyl precursor that she had sent to a then-confidential source (and which was seized at an undercover DEA mailbox in New York), as well as a shipment that she had supplied to a Sinaloa-based client and then learned contained sham fentanyl precursor chemicals. PSR ¶ 33. In the course of the conversation, Rubio Zea also advised UC-1 that she had recently wired approximately $120,000 to a company in China to purchase fentanyl precursor chemicals, that she had ordered this fentanyl precursor for one of her customers in Sinaloa, and that she knew that the fentanyl precursor would be used to manufacture fentanyl, including fentanyl destined for New York. PSR ¶ 34. Rubio Zea further stated that after she wired the money, the company in China sent several shipments of purported fentanyl precursor chemicals, including the one-kilogram shipment to the DEA-controlled mailbox in New York, New York, as well as the shipment of the sham fentanyl precursors chemicals described above. PSR ¶ 35. According to Rubio Zea, she then received threats from that customer, who demanded his money back, and explained that Rubio Zea had unsuccessfully sought a refund from the Chinese company, forcing her to repay the customer with her own money. PSR ¶ 35. At the meeting, in UC-1's presence, Rubio Zea also contacted one of her suppliers over an encrypted messaging application and identified the supplier as someone who would ship fentanyl precursor to UC-1. PSR ¶ 36. After the meeting, UC-1 made direct contact with the supplier to negotiate a fentanyl precursor transaction, and Rubio Zea texted UC-1 several screenshots of wires that she sent to another China-based company, Shezhen Bright Summer International Co., Ltd., which were payments for fentanyl precursor chemicals that Rubio Zea had ordered. PSR ¶¶ 36-37.

Next, a few months later, at the September 2022 meeting, Rubio Zea advised UC-1 that she had a good relationship with the Sinaloa Cartel, based in large part on her relationship with a particular Mexico-based client, a Sinaloa Cartel member, who was sufficiently close to Rubio Zea that he had stayed at her home for about 30 days. PSR ¶ 38. Rubio Zea explained that the Cartel member was the same individual described above who had tried to purchase approximately $120,000 of fentanyl precursor from Rubio Zea several months prior but had received sham

chemicals. Rubio Zea further explained that this individual, whom she had repaid for the sham chemicals, worked for someone in the Cartel who made fentanyl and confirmed that she continued to supply this individual with precursor chemicals for the manufacture of the Cartel's fentanyl. PSR ¶ 39. At the meeting, Rubio Zea also advised UC-1 that she was scheduled to travel to Wuhan, China in approximately 45 days to visit different chemical companies to ensure that they would be able to provide Rubio Zea with sufficiently large quantities of fentanyl precursor chemicals with which she could supply the Cartel in Sinaloa. PSR ¶ 40.

After the September meeting, Rubia Zea continued to communicate with UC-1. During those communications, Rubio Zea attempted to negotiate the sale of counterfeit fentanyl pills to UC-1, including by sending UC-1 a picture of a bag of pills marked "M30," along with the message "For your client," and subsequently advised UC-1 that a sample of 1,000 pills would cost $3,000 in USD. PSR ¶ 41. A screenshot of Rubio Zea's text messages to UC-1 with the photograph of the pills is below:



In addition to the foregoing, Rubio Zea also sent UC-1 screenshots of wire transfers she had made to Chinese chemical suppliers in USD for the purchase of fentanyl precursor chemicals, including a series of invoices dated between in or about December 2021 and February 2022, totaling approximately $100,000 USD. PSR ¶ 42.

## II. Procedural History and Guidelines Calculations

On April 4, 2023, Rubio Zea was charged in three counts of a six-count indictment. Count Two charged her with participating in a conspiracy from at least in or about 2014, up to and

including on or about April 4, 2023, to (i) import 400 grams and more of fentanyl into the United States, (ii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, and (iii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl on board an aircraft registered in the United States, in violation of Title 21, United States Code, Sections 952(a), 959(a), 959(c), 960(a)(1), 960(a)(3), 960(b)(1)(F), and 963. Count Three charged her with participating in a conspiracy to distribute and possess with intent to distribute 400 grams and more of fentanyl, in violation of Title 21, United States Code, Section 846. Count Six charged her with participating in a conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

On March 17, 2023, Rubio Zea was arrested in Guatemala and on July 20, 2023, she was extradited to the United States, where she was remanded and remains in detention. PSR ¶ 45.

On June 10, 2025, pursuant to a plea agreement with the Government (the "Plea Agreement"), Rubio Zea pled guilty before this Court to Count Two. PSR ¶ 1. Because Rubio Zea meets the safety-valve eligibility criteria set forth in 18 U.S.C. § 3553(f)(1)-(5), there is no mandatory minimum term of imprisonment. PSR ¶ 110. The Plea Agreement between the parties stipulated to a total offense level of 31, a criminal history category of I, and a Stipulated Guidelines Range of 108 to 135 months' imprisonment and is consistent with the U.S. Probation Office's calculation. PSR ¶¶ 68, 72, 110. The Stipulated Guidelines Range was calculated as follows:

> Pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), because the defendant is responsible for conspiring to import more than 38 kilograms of fentanyl, the base offense level is 38. PSR ¶ 59. Pursuant to U.S.S.G. § 2D1.1(b)(18), because the defendant meets the safety-valve criteria set forth in U.S.S.G. § 5C1.2(a), a two-level deduction is warranted. PSR ¶ 60. Pursuant to U.S.S.G. § 3E1.1(a) and (b), because the defendant accepted responsibility and timely notified the Government of her intention to enter a plea of guilty, a three-level deduction is warranted. PSR ¶¶ 65-66. Pursuant to U.S.S.G. § 4C1.1(a)(1)-(10), because the defendant meets the zero-point offender criteria, a two-level deduction is warranted. PSR ¶ 67.

Probation recommends a sentence of 72 months' imprisonment, followed by two years of supervised release, and no fine in light of the defendant's inability to pay. PSR at p. 28.

## III.  Relative Culpability

Rubio Zea is one of approximately two dozen defendants charged in this case. As a broker and distributor who facilitated the acquisition of fentanyl precursor chemicals for the Sinaloa Cartel, rather than a full-fledged member of the Cartel, Rubio Zea did not participate in Cartel violence or threats. Thus, unlike the Chapitos and their top lieutenants, for example, Rubio Zea was not charged in Count One of the Indictment, which charges five of the defendants with participating in a continuing criminal enterprise, from at least in or about 2014, to at least on or about April 4, 2023, in violation of Title 21, United States Code, Section 848, based on those defendants' roles as principal enablers, administrators, organizers, and leaders of the Sinaloa

Cartel. She is also less culpable than the remaining defendants who personally distributed kilogram quantities of finished fentanyl and laundered hundreds of thousands of dollars for the Chapitos.

## IV. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established [in the Guidelines];
(5) any pertinent policy statement [issued by the Sentencing Commission];
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

### B. A Sentence Below the Stipulated Guidelines Range Is Warranted

A substantial term of imprisonment, albeit one below the Stipulated Guidelines Range of 108 to 135 months' imprisonment, would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

The seriousness of Rubio Zea's conduct alone warrants a substantial term of imprisonment. By serving as a supply channel connecting Chinese chemical companies and a Mexico-based member of the Sinaloa Cartel, Rubio Zea played an important role in providing the Sinaloa Cartel with the raw materials it needed to maintain and grow its massive and sophisticated international fentanyl enterprise. Although she was but one point of connection for the Cartel, the contributions of brokers such as Rubio Zea are foundational to the Cartel's ability to produce and distribute this lethal substance cheaply and to conceal their procurement operations using seemingly legitimate channels within the global supply chain. Simply put, the Cartel's destructive and far-ranging drug trafficking operations could not exist without the active assistance of enablers and facilitators like Rubio Zea, who operate with knowledge that their contributions are furthering the fentanyl trade. And while Rubio Zea did not personally manufacture or distribute fentanyl, her conversations with UC-1 make clear that she understood that the chemicals she was routing to Mexico were being used to produce bulk fentanyl for sale by the Cartel. Further contributing to Rubio Zea's culpability is that she specifically used deception, including a front company, to disguise her unlawful activities as legitimate international business transactions and that she operated with the understanding that her Chinese suppliers, too, were employing methods to disguise their sale of fentanyl precursors.

As the Court is aware, fentanyl is a particularly dangerous substance, where even small amounts can prove to be fatal. Indeed, according to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[3] The crisis has only worsened. According to the CDC, 2023 marked the first time in U.S. history that the overdose death rate topped 112,000 in a 12 month period, with young people and people of color among the hardest hit.[4] The

---

[3] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text= Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022; *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at *1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal. In 2020, the National Institutes of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year. Fentanyl can wreak[] havoc on entire communities . . . [and] destroy[] lives.").

[4] Brian Mann & Aneri Pattani, In 2023 Fentanyl Overdoses Ravaged the U.S. and Fueled a New Culture War Fight, Nat'l Pub. Radio, Dec. 28, 2023.

magnitude of this calamity now appears to have eclipsed every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[5] The cost to ordinary families destroyed by the fentanyl crisis is incalculable, and there is a real need to punish those who enable and directly contribute to the manufacture of such a deadly substance through the acquisition of precursor chemicals. Indeed, as Judge Gardephe recently stated when imposing a sentence of 15 years' imprisonment on a defendant who ran a company that shipped fentanyl precursor chemicals to Mexico: "Fentanyl is the number one most serious drug problem in the United States, and it kills tens of thousands of Americans every year. It is poison. And those who market for profit the chemicals necessary to make this poison – when apprehended – must be severely punished." *United States v. Wang*, 23 Cr. 302 (PGG), Sentencing Tr. at 61-62 (Sept. 19, 2025). This holds true in this case, as well, and the seriousness of Rubio Zea's conduct counsels strongly in favor of a significant sentence.

The need to afford adequate deterrence to Rubio Zea and others similarly situated, and to promote respect for the law, also speaks loudly to the need for a serious sentence in this case. *See* 18 U.S.C. §§ 3553(a)(2)(A)-(B). With respect to specific deterrence, although Rubio Zea has no known criminal convictions, this does not reduce the need to deter her from future criminal conduct. Indeed, Rubio Zea demonstrated that she has the sophistication and ability to use legitimate businesses to engage in criminal conduct and to do so at international scale. While she undoubtedly experienced traumatic and difficult circumstances earlier in her life, as outlined in her submission, and that upbringing may have played a role in decisions she made to engage in criminal conduct, Rubio Zea is a savvy and capable businesswoman who could, if not sufficiently deterred, easily return to engaging in similar conduct to that which resulted in her arrest and conviction. Specific deterrence is thus a significant consideration in this case. Just as important is the need for the sentence to afford general deterrence and to promote respect for the law. The sentence imposed should demonstrate to drug traffickers around the world—including individuals involved in brokering precursor chemicals—that they are not untouchable and that those who support the fentanyl trade through the brokering of precursors chemicals will be held accountable.

In her sentencing submission ("Def. Br."), Rubio Zea concedes the seriousness of her conduct but argues that Probation's recommendation of 72 months does not adequately account for the fact that she was "was many steps removed" from the Cartel's fentanyl operations "as a broker of precursor chemicals, not as a trafficker of finished fentanyl," or her commitment to rehabilitation and exemplary conduct in detention since her arrest. Def. Br. 4-5. While the Government does not necessarily concede all of the defendant's arguments—and, in particular, does not think that the defendant was "many steps removed" from the production of fentanyl—the Government does recognize the force of certain points made by the defendant in her submission. In addition, as noted above, Rubio Zea did not engage in violence or threats of violence, or the use and possession of firearms, in connection with the charged conduct. The Government thus recognizes that, as compared to several other charged co-defendants in this case, these are mitigating factors that may be considered for purposes of fashioning an appropriate sentence in

---

https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction (last visited January 20, 2026).

[5] *Id.*

this case. 

## V.  Conclusion

In sum, Rubio Zea's conduct warrants a substantial term of imprisonment but the mitigating factors in her case also warrant full consideration. For the reasons set forth above, a substantial term of imprisonment, albeit one below the Stipulated Guidelines Range of 108 to 135 months' imprisonment, would be sufficient but not greater than necessary in this case to meet the goals of sentencing under Section 3553(a).[6]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:  /s/
Nicholas Bradley/Jane Chong
Sarah Kushner/David Robles
Assistant United States Attorneys
(212) 637-1581/-2263/-2676/-2550

cc: Judith Vargas, Esq.

---

[6] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).